Pages 1 - 61

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 18-00465 MMC** |
| | ) | |
| UNITED MICROELECTRONICS | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, July 21, 2021


**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:
                    STEPHANIE M. HINDS
                    ACTING UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, 11th Floor
                    San Francisco, California  94102
          BY:  **LAURA E. VARTAIN HORN**
               **ASSISTANT UNITED STATES ATTORNEY**


For Defendant Fujian Jinhua Integrated Circuit Co., Ltd.:
                    SKADDEN, ARPS, SLATE, MEAGHER
                     & FLOM LLP
                    300 South Grand Avenue
                    Los Angeles, California 90071
          BY:  **MATTHEW E. SLOAN, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

1    **APPEARANCES VIA ZOOM:**   (CONTINUED)

2    For Defendant Fujian Jinhua Integrated Circuit Co., Ltd.:

3                        SKADDEN, ARPS, SLATE, MEAGHER
                         & FLOM LLP

4                        525 University Avenue, Suite 1100
                         Palo Alto, California 94301

5                   BY:  **JACK P. DICANIO, ATTORNEY AT LAW**

6

7    Also Present:

8    For Micron Technology:

9                        JONES DAY
                         Silicon Valley Office

10                       1755 Embarcadero Road
                         Palo Alto, California 94303

11                  BY:  **NEAL J. STEPHENS, ATTORNEY AT LAW**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Wednesday, July 21, 2021**                                    **3:15 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Criminal Case Number 18-465, |
| 5 | United States of America versus Fujian Jinhua Integrated |
| 6 | Circuit. |
| 7 | Will counsel please state your appearances for the record, |
| 8 | starting with Government counsel. |
| 9 | **THE COURT:**  Is someone representing the Government? |
| 10 | **THE CLERK:**  I see her. |
| 11 | **THE COURT:**  Well, she's not talking. |
| 12 | **THE CLERK:**  Yes. |
| 13 | **MR. DiCANIO:**  Laura's not usually shy, though. |
| 14 | **THE COURT:**  Well, we're going to have to bring whoever it |
| 15 | is -- if this is Ms. Vartain, she's somewhere in the ether. |
| 16 | (Laughter.) |
| 17 | **THE COURT:**  So if you can get her visibly participating, |
| 18 | that would be a big help. |
| 19 | **THE CLERK:**  Let me send her an e-mail, Your Honor. |
| 20 | **THE COURT:**  Okay. |
| 21 | **THE CLERK:**  I've asked her to unmute, but that didn't seem |
| 22 | to help. |
| 23 | **THE COURT:**  Did you ever see her on the screen? |
| 24 | **THE CLERK:**  No.  Uh-uh, no. |
| 25 | **THE COURT:**  No?  Then she wasn't -- |

1        **MR. SLOAN:**  She has not appeared yet.

2        **THE COURT:**  -- really here.

3        It's not just a question of unmute.  It's a question of

4    unhide.

5        **MR. SLOAN:**  Yeah.  Not sure.

6        **THE COURT:**  I don't even know if she's participating at

7    this point.  So, we can't really tell.

8        Let's see.  What does it say?  Participants, well, there's

9    crowds of people at your various offices listening in, in some

10   way.

11                        (Pause in proceedings.)

12       **THE COURT:**  Well, we can all take a break for five minutes

13   while you try and locate whoever you thought was on the line

14   here.

15       **THE CLERK:**  Sorry.  I was muted.

16       **THE COURT:**  Okay.

17       **THE CLERK:**  Let me try to call her.  Obviously, the e-mail

18   and asking her to unmute hasn't helped.

19       **MS. VARTAIN:**  Good afternoon, Tracy, Your Honor.

20       **THE COURT:**  Where are you?

21       **MS. VARTAIN:**  The Government is not participating in this

22   hearing.  We're not a party to the motion.

23       **THE COURT:**  All right.  So you just --

24       **MS. VARTAIN:**  But I am --

25       **THE COURT:**  -- want to be --

1      **MS. VARTAIN:**  -- present.

2      **THE COURT:**  -- back there.

3      Okay.  Fine.

4      All right.  Then we don't really --

5      **MS. VARTAIN:**  Correct.

6      **THE COURT:**  -- need to start with Government counsel

7  because, as Ms. Vartain points out, she's an interested party,

8  so to speak, but not an immediate participant.

9      So let's, then, go to counsel for Jinhua, the defendant.

10     **MR. SLOAN:**  Your Honor, good afternoon.  Matthew Sloan

11 from Skadden Arps on behalf of Fujian Jinhua, and my colleague

12 Jack DiCanio is with me.

13     **THE COURT:**  Okay.  Just a minute.  I'm just -- for

14 whatever reason -- hang on.

15     There we go.

16     All right.  And then for Micron?

17     **MR. STEPHENS:**  Good afternoon, Your Honor.  It's Neal

18 Stephens on behalf of non-party and victim Micron Technology.

19     **THE COURT:**  Okay.  So Micron's calling itself "victim."

20 Jinhua is calling them "third party" or "non-party" or

21 whatever.

22     Anyway, what we have is a motion to quash, and I assume

23 you're all ready to get going on that.

24     So I have here the various requests that are being made.

25 And we may as well start with the first group, if you will,

which is Requests 1 to 5 and 7; so skipping 6.

     And as to 1 to 5 and 7, Micron, in an effort to at least move things along a bit, did provide certain information -- or they say they did, at least -- to the defendant, requesting party, but that they felt that there should be some limitations placed on those requests.  They recognize that the material could be relevant and was specific enough in general, although they complained a bit about it, but they did turn materials over.

     As I understand it -- and I'll just frame this up, and then you can correct me if I'm wrong about this -- Micron wants to limit the time frame with respect to these particular documents to, essentially, a period when the three individual defendants were employed at Micron.  And the last person to leave was April 26 of 2016.  Micron didn't really state a start date.

     But Jinhua had agreed -- after they got some pushback from Micron, they agreed to modify the dates covered to be from October 1, 2015 -- and I didn't hear any complaint about that from Micron -- but then to have a more extensive period that would end on September 27, 2018.

     Now, the October 1 date appears to be the date that Mr. Chen is alleged to have begun recruiting, essentially, people away from Micron and over to UMC.  And the September date in 2018 is the date in the indictment that the conspiracy

1    that's charged is alleged to end.  So the so-called, at least,

2    possible crime period is the date that we've got here as set

3    forth by Jinhua.

4         So do I have those dates correct at least, the parties'

5    positions, before I start commenting about them?

6         **MR. STEPHENS:**  Yes, I think so, Your Honor.

7         And just for Your Honor's benefit, that's not the full

8    scope of Micron's objection to the --

9         **THE COURT:**  Well, there's --

10        **MR. STEPHENS:**  -- the balance of these requests.

11        **THE COURT:**  No.  There's another objection that Micron has

12   as well, but I wanted to first get just the dates down.

13        And then Micron wanted to limit the entities that would be

14   producing this type of material to their Taiwanese subsidiary,

15   which I think is MMT, and then what they called Micron's,

16   quote/unquote, other operation in Taiwan.  I didn't know what

17   that was.

18        So let's assume the dates are at least what people are

19   talking about, since I didn't hear anything to the contrary.

20        And Jinhua had agreed to a -- I'm sorry.  No, I'm going to

21   take that back.  That was Jinhua's agreement to that.  Wait

22   a minute.  Then what's Micron's?  I can't even read my notes

23   now.  Just a second.

24                        (Pause in proceedings.)

25        **THE COURT:**  No.  I think that was what Jinhua wanted.  And

1   Micron wanted to limit it to where the three individual

2   defendants had worked, which I think was only at MMT.

3        Is that right?

4        **MR. STEPHENS:**  Yes, Your Honor.

5        **THE COURT:**  Okay.

6        **MR. STEPHENS:**  And then there are additional objections

7   beyond those as well.

8        **THE COURT:**  Really?  What were they?

9        **MR. STEPHENS:**  Yes.

10       So, Your Honor, what we tried to do on these is provide a

11   limited scope of documents that are sufficient to establish

12   what's been requested in 1 through 5 and 7.  The balance of --

13       **THE COURT:**  Yes.  But what were the additional limits?

14   Not why.  Just, what are they?

15       We've got a ton of things to go through here.

16       **MR. STEPHENS:**  Sure.

17       **THE COURT:**  I just want to find out where -- those are the

18   limits that I saw.  I flipped the parties on the last one.

19   Sorry.  But Micron wanted to limit the entities, as I

20   understand it, to MMT.  And it sounds like Jinhua wants to

21   include something called "other operations in Taiwan."  I don't

22   even know what they're talking about.  I was going to ask them

23   about it.

24       Now, are there other limits, besides time and entities,

25   that you're talking about?

1    **MR. STEPHENS:**  Yes, Your Honor.  So we would object to the

2    balance of the requests for failing the *Nixon* test because they

3    are not appropriately specific; they won't yield admissible

4    evidence; and there's also going to be some relevance issues.

5        **THE COURT:**  Well, it's just, I can't tell.  You apparently

6    gave them what you thought met whatever the test was.  You say

7    you gave them stuff; right?

8        **MR. STEPHENS:**  We did, Your Honor, as a means of trying to

9    take some issues off the Court's plate.

10       **THE COURT:**  Well, that's great.  I appreciate that.  But

11   then, if they're all just back there again applying to

12   whatever's left, I haven't really saved anything.

13       So let me just see if I've got it straight.  If you want

14   to object to all of these as essentially saying, "We don't have

15   to give you anything.  None of it's any good.  You're stuck

16   with what we're giving you, and the Court should say you're not

17   entitled to anything," if that is the position Micron's

18   taking -- it wasn't clear that that's what you were doing,

19   possibly because you did turn documents over apparently with

20   some idea of what they were talking about.  So I don't know.

21       Let's just take the first one, which is handbooks.  That's

22   pretty darn specific.  Okay?  Any handbooks that were

23   operative, I guess, being given to the employees -- because

24   that's all we're talking about here for a moment.  All these

25   are really in-house documents.  You're not talking about

1   licensees at this point, as far as I can tell, except maybe how

2   an in-house person might treat a licensee, but this isn't like

3   a license or something.

4        So you've got handbooks.  That's express.  If you've got

5   more than one handbook during this period that they used, then

6   they would like to have all of them for a period beyond what

7   Micron thinks is relevant and as handed out by entities beyond

8   those that, I guess, Micron thinks is relevant.

9        So what I want to get squared away here, if we could just

10  do this, is what Jinhua meant by "Micron's other operations or

11  operation in Taiwan."

12       **MR. SLOAN:**  Your Honor, we think -- the only corporate

13  operation that we're aware of in Taiwan is

14  Micron Microelectronics Taiwan, MMT.

15       To the extent, though, that the parent company or some

16  other subsidiary had -- was -- had operations in Taiwan that

17  may have -- that these individuals, the individual defendants

18  or other people involved in this case may have been involved in

19  in some way, then we would ask for any policies that involved

20  those entities as well.

21       **THE COURT:**  Well, that gets to be perhaps a little less

22  specific, because then somebody's got to look at it and figure

23  out.  But let's just do handbooks for a moment because that is

24  a specific type of document.

25       If what Jinhua understands to exist is, essentially, where

1    these people work was MMT, then it really isn't different as
2    far as the people or the entity MMT that Micron wants to limit
3    it to.

4        And we're only talking handbooks, for a moment, because
5    you guys lumped them all together.  I could see why they could
6    be treated differently, but we're just lumping it together.
7    I'm going to break it out and do handbooks.

8        Then you've got a time frame.  Now, here's the thing.  I
9    gave this some thought, and I'll just tell you what my kind of
10   general impression is.  You can weigh in, if you want; but keep
11   in mind, you don't want to be here all day talking about this
12   stuff.  Okay?  Or at least I don't.

13       Okay.  So let's go to this.  It sounds like Micron's view
14   is that the only relevant efforts to maintain confidentiality
15   would be during the time that the people involved worked at
16   MMT.  All right?  But I'm not sure that's right, and let me
17   just explain why.

18       Okay.  These people are alleged -- not just those
19   individuals but Jinhua and, initially, UMC -- to have conspired
20   over a substantial period of time.

21       And let's just say, for example, that at Point A, when the
22   people left and arguably took material with them, the
23   procedures were okay.  All right?  But just taking them might
24   not be enough to really bring a claim or show the criminality
25   here; it might be.  But then it's alleged that, okay, you took

 1  them; and not only did you take them, you started using them.

 2       Now, let's say that at some point after they left, Micron,

 3  for some reason, had a big gap in their security, and the whole

 4  picture had changed.

 5       So it sounds to me like at any time that someone is saying

 6  you, Jinhua, through your people, committed a crime, that you

 7  have to look at whether what somebody was doing with that

 8  alleged secret was sufficient to maintain its secrecy.

 9  Otherwise, at that point it might not be a trade secret.  Or

10  maybe they fixed it up later and actually patched a hole that

11  was patchable.

12       So I thought -- at first, I was going to say, as Micron

13  did, okay, these people left; they're gone.  But then it struck

14  me that there's behavior all along the line and that, under

15  those circumstances, that it seemed more appropriate -- and I'm

16  just doing handbooks now because it's the easiest -- that that

17  would be appropriate.  If they had handbooks and they weren't

18  adequate throughout the time that these folks are accused of

19  committing crimes, then at any given point maybe they're off

20  the hook.

21       So I thought the broader time frame was okay.  That could

22  be incorrect thinking, but that's how I sort of came to that

23  conclusion.

24       And I'm willing to limit it to MMT, since they're the ones

25  that really were in charge of these folks.  But, yeah, it

1    seemed the handbooks were pretty specific.

2        **MR. SLOAN:**  Your Honor, if I can, I agree with your

3    analysis.

4        And one other point to consider is that, obviously, this

5    is a conspiracy.  The Government has alleged that there may be,

6    you know, unnamed co-conspirators.  So we don't know whether at

7    some later point they would -- you know, before trial that they

8    would claim that maybe there are other people involved who were

9    still there.

10       **THE COURT:**  Well --

11       **MR. SLOAN:**  We haven't seen any evidence of that.

12       But I think your point is the main one, but that's an

13   additional reason that I think the time frame that we specified

14   is appropriate.

15       **THE COURT:**  Yeah.  I don't want to expand based on

16   "we don't know" and "maybe."  That's Micron's whole point here,

17   is you can't just be guessing about what would happen.

18       This isn't like civil discovery.  And then they say:  Hey,

19   you guys didn't want civil discovery, or at least you didn't

20   want us discovering you.  Now you want you to be discovering us

21   but in the criminal case.

22       So they're not happy about that.

23       And to the extent that there is a difference -- and there

24   is, as they point out -- I think limitations do apply.

25   Admissibility is a big one.

 1          So anyway, that was my thought using handbooks.  Now, if

 2     you want to spin off it and look at the others, no, they don't

 3     know that these documents exist.  In other words, if you need

 4     to know something does already exist and you were asking for an

 5     identified document already that has come up or been mentioned

 6     in the course of the proceedings -- it doesn't have to be a

 7     document.  It can be a criminal case and you want physical

 8     evidence.  But that kind of applies to handbooks too.  They

 9     don't know you have a handbook.

10          But did you get any handbooks, Mr. Sloan?  Anybody give

11     you a handbook?

12          **MR. SLOAN:**  We have some documents.  I'm not sure if we

13     have a handbook per se.

14          **THE COURT:**  You don't even know if they gave you a

15     handbook?  I mean, that's sort of obvious, isn't it, a

16     handbook?

17          Okay.  All right.  Well, the other documents, I guess you

18     could say that one could argue as to all the other things:

19     Hey, you guys don't even know we have this.

20          And some of the requests say "documents reflecting."

21     Other requests just ask for the policies and procedures, as if

22     you just want to know what's in their mind that they think's a

23     policy, not even if it's reflected in a document.

24          I fed into all the ones you left out "document

25     reflecting."  I just read it as including it.  That's Number 4;

it's Number 5; and -- yeah, that were those two.  It didn't

even say "documents reflecting," but let's say that's what you

meant and that that was sort of a clerical oversight.

So then policies and procedures.  Now, I guess this could

be considered some kind of unreasonable task of trying to

collect up training materials and other documents about what to

do with laptops and what your rights are with respect to

*Bender*.  And it could get pretty broad.  I agree, if it's all

just in the handbook, of course, that would be very -- not

being cute about it -- handy.  If it is in a bunch of scattered

documents, I don't know.

So maybe Mr. Stephens could say, when you were trying to

cut this thing off at the pass, did you deliver a handbook by

any chance, one or more?

**MR. STEPHENS:**  Yes, Your Honor, we did.  We produced

three.  We also produced an employment agreement.

I think the Court has just hit on an important point that

impacts why we think the remaining scope on these is too broad

and also impacts all their other requests which we think should

be quashed.

And it's this:  To the extent that they're asking

questions for "all documents" or "any and all documents" or

"documents reflecting," there's a series of cases in the

Ninth Circuit and in the Northern District of California which

quash all of those requests.

1        And I'm referring the Court to the *Reed* case in the

2   Ninth Circuit, the *Reyes* case in the Northern District, the

3   *Collins* case in the Northern District, and the *Johnson* case in

4   the Northern District.

5        Any time you have a situation where it's a request for

6   "any and all" or "all documents reflecting," it's not specific

7   enough and it's too broad, and the courts have held that it's

8   an abuse of the Rule 17 subpoena.

9        **THE COURT:**  Okay.  Now, I may not have thought that you

10  were making as broad a brushed objection in light of the fact

11  that you did turn certain things over.  So let me ask you.

12       In identifying some documents that you felt, even though

13  they weren't pinpointed, you would give them to them as if they

14  had asked for it specifically, one is handbooks.  I think that

15  does not fall into the "just any old document you might have

16  lying around."

17       All right.  Then you have employment agreements that you

18  felt would encompass some of these limitations.  And an

19  agreement might or might not, and apparently, Micron's or MMT's

20  did.  So then that's fine.

21       Was there any other category of document that you, to your

22  knowledge or recollection, turned over already?

23       **MR. STEPHENS:**  Yes, Your Honor.  We produced some

24  documents sufficient to show trainings that the individual

25  defendants here would have received, as well as some documents

1    to show the policies and procedures that would have been in

2    place during their employment there sufficient to respond to,

3    for example, Request Number 3 or Number 4 and Number 7.

4        **THE COURT:**  In other words, if I read Number 3 as any

5    training manual or materials that are distributed, for example,

6    to employees, that would be -- a manual would be kind of like

7    the handbook; or if it was a handout that wasn't called a

8    manual, that at least would be a specific thing that somebody

9    could maybe find.

10       But then I don't know about some of these other materials;

11   that you found things, apparently, that weren't in a

12   training -- I don't know -- manual but some, maybe, overarching

13   kind of a document.

14       Maybe I'll just ask you -- don't answer that for a minute.

15   Okay?

16       Looking at the things that they're trying to ask about --

17   Did you tell people what they could do with their laptops?  Did

18   you tell people what they could do about taking things away

19   off-site?  Did you tell them anything about how they're to deal

20   with third parties, contractors and other people? -- that kind

21   of stuff, was that covered in the handbook?

22       **MR. STEPHENS:**  Yes.  At some level, that's correct,

23   Your Honor --

24       **THE COURT:**  Okay.

25       **MR. STEPHENS:**  -- which is why --

1        **THE COURT:**  Okay.  Let me just -- wait.  Just let me get

2   that point.  You can then argue afterwards.  Let me just see,

3   because I don't want to lose my train of thought and it may

4   benefit you.  Okay?  You don't know where I'm going with it.

5        Okay.  It's in the handbook.  And then was there a

6   separate training document or just papers of some sort?  Was

7   training in the -- probably not in the handbook.  This would be

8   something that would be more like -- I don't know -- something

9   after you'd been there for a while and you might have a class

10  on something or a lecture.  As I say, it's kind of hard, as you

11  say, to figure out exactly what they're asking for.

12       But did any training materials get turned over?

13       **MR. STEPHENS:**  Correct.  Yes, Your Honor.

14       **THE COURT:**  Okay.

15       **MR. STEPHENS:**  Some did.

16       **THE COURT:**  Okay.  Do you happen to know what type of

17  document those things were contained in, the training?

18       **MR. STEPHENS:**  Yeah.  It would relate to covering the

19  security of Micron's physical facilities, as an example.

20       **THE COURT:**  Okay.

21       **MR. STEPHENS:**  And information security as well.

22       **THE COURT:**  Training might be tough unless there was some

23  manual that was out there that -- okay.

24       Then you've got this one about what you're allowed to

25  bring from former employers and what you can take when you

1    leave.   Okay?   Kind of two sides of a similar coin, or the same

2    coin.

3         Were there documents that were provided covering that kind

4    of subject?

5         **MR. STEPHENS:**   Correct.   Yes, Your Honor.

6         **THE COURT:**   Okay.   And then I think this enforcement and

7    disciplinary action, unless somebody was really asking for a

8    particular kind of document, that gets kind of hard to do

9    because -- I'm not sure.   Do you think that some of the things

10   that you turned over -- this is Number 7 -- encompassed

11   enforcement?

12        Now, that doesn't seem like something you'd be telling

13   people.   That would be a reactive kind of a document.   And I

14   don't know if even, sort of, privileged material may be

15   involved there with people's privacy or something.   I wasn't

16   sure.

17        **MR. STEPHENS:**   Yes, you're right, Your Honor, which is why

18   we were trying to just produce documents sufficient, that

19   wouldn't either relate to privilege or yield a wild fishing

20   expedition on this one that would have no bearing on this

21   matter.

22        **THE COURT:**   To your knowledge, was anything turned over

23   about just Micron enforcement policies, such as -- I don't

24   know.   Sometimes a business will have a no-tolerance policy for

25   physical encounters.   Anything like that?   I'm not even sure

1    where it would be contained, but maybe you know whether you

2    already did it.

3         **MR. STEPHENS:**  Yes, Your Honor.  I know of at least a

4    document or two in there that talks about Micron reserving the

5    right to take action if someone steals their confidential

6    information, for example.  I think that addresses your

7    question.

8         **THE COURT:**  It does, yes.

9         As far as actual action taken against any employee who may

10   have been found to have violated a confidentiality rule at

11   Micron -- I'll just say "Micron" because it's faster -- do we

12   know if anything like that was turned over?  Were you more

13   protective of that particular kind of information?

14        **MR. STEPHENS:**  No.  Your Honor, at that point I think

15   we're getting into what is Request Number 6 and Request

16   Number 8; more particularly Request Number 8.  And we did not

17   produce documents and are --

18        **THE COURT:**  No, not --

19        **MR. STEPHENS:**  -- moving to quash Request Number 8.

20        **THE COURT:**  No, no.  I'm looking at 7.  Take a look at 7.

21   7, at the third line down, is not -- in other words, they want

22   the policies, and then they switch from policies to action.

23        **MR. STEPHENS:**  Yes.

24        **THE COURT:**  I'm not sure if they meant policies concerning

25   that kind of action or whether they were actually asking for

1    the action.  So maybe I'll ask Mr. Sloan.

2        Now you can add "ambiguity" to your list of objections.

3        **MR. STEPHENS:**  Thank you, Your Honor.

4        **MR. SLOAN:**  Your Honor, the purpose here was very much --

5    you know, a policy to ensure the security of the trade secrets

6    is one thing; but in order to meet the standard, you have to

7    enforce it.

8        So we were asking for exactly what you're saying, which is

9    any enforcement actions -- suspension, termination --

10   disciplinary actions that had been taken against people who

11   were found to have violated the policies and procedures;

12   because if there's evidence that people were violating them but

13   were not disciplined in some way, that would be evidence that

14   the company had failed to take reasonable measures to secure

15   the secrecy of that information.

16       **THE COURT:**  Well, I think it starts to get problematic to

17   a certain extent because, first of all, we don't know if

18   anybody violated it or, if they did, that Micron knew about it.

19       And then you get to, okay, let's say they did find someone

20   who walked off with something or did something before these

21   defendants -- okay? -- before these defendants.  Did they just

22   say, "Oh, fine"?  Did they fire them?  Did other people know it

23   wasn't being enforced?  How much do you have to enforce?

24   What's reasonable?

25       I mean, I'm not sure that this doesn't get off into a

1  whole separate subject, essentially, of discipline, if you

2  will.  We know what they say their policies are, and I can

3  understand how you would say, all right, but if you don't do

4  anything about it, if it's just crying wolf, doesn't do any

5  good.

6       And so I'm not sure, though, if there's any category of

7  any document that could be identified other than to just say:

8  Yeah, we'd like to know anything that you've got out there that

9  reflects what you might have done to someone.

10      This could go on forever, trying to collect up this stuff.

11 And so I think that that is a problem if you knew that somebody

12 had violated something and did get away with it before, like is

13 alleged that UMC people did.  All right.  At least they're not

14 alleging Jinhua was working there and left.

15      Okay.  But for UMC, they didn't find out -- well, yeah,

16 you could say this.  To the extent they knew that anything had

17 happened before everybody was gone and didn't discipline anyone

18 who they knew about, that might be relevant.  Okay?  So as far

19 as we know, the only people they know about are Chen, Ho,

20 Wei -- is that it? -- or Wang.

21      **MR. SLOAN:**  Mr. Kenny Wang, correct.

22      **THE COURT:**  Kenny Wang, yeah.

23      So I think -- were they -- did they know about anything

24 until they were actually gone?  You couldn't fire them, because

25 they were gone.  Okay.  Was anybody still there to be

 1  disciplined?  I don't think so of our people.

 2      **MR. SLOAN:**  Your Honor, not that the Government has

 3  identified.

 4      **THE COURT:**  Okay.

 5      **MR. SLOAN:**  But, again, our intent here was to sort of

 6  discreetly ask for.  I would assume that if there were

 7  enforcement or disciplinary actions taken against individuals,

 8  those would be rel- -- you know, those would be easy to find.

 9  They would be in one particular place.

10      And they would be relevant for the exact reasons you've

11  said, which is that if people were violating the policies and

12  were not disciplined, that would show a lack of rigor in

13  enforcing the policies and might show that they failed to take

14  reasonable precautions, which is an element that the Government

15  needs to prove in order to show that these were trade secrets.

16      **THE COURT:**  Well, the problem is that it seems to be just

17  a very, very broad list of documents that comes under this so

18  that the recipient is left to try and sort through this and

19  figure it out, which could be very typical of civil discovery

20  but maybe not under this rule.  And that's the concern that I

21  have.

22      Frankly, I haven't really had this come up in any way like

23  this in the past.  But then this case has produced all kinds of

24  issues that haven't necessarily come up in the past.

25      So I will say this:  that to the extent that they've

1   already given documents that they say cover every subject

2   except disciplinary action, as I understand it -- is that fair

3   to say or not, Mr. Stephens?

4       **MR. STEPHENS:**  We have not provided documents related to

5   disciplinary action.

6       **THE COURT:**  Yes, that's what I said.  But other than --

7       **MR. STEPHENS:**  Correct.

8       **THE COURT:**  -- that, is it your statement that the time

9   frame may be narrower but that you, for whatever time frame you

10  thought was pertinent, that you have delivered documents that

11  do show Micron's policies regarding all the things they asked

12  for and if it's not in there, then they didn't have a policy

13  about it?

14      **MR. STEPHENS:**  Correct.  So, yes, Your Honor, Micron has

15  produced documents sufficient on 1 through 5 and 7.

16      **THE COURT:**  Well, you can't just say "sufficient."

17      So I'm just saying, if each one of these -- let's say one

18  is handbooks.  You gave them the handbooks.  I know that.

19      **MR. STEPHENS:**  Correct.

20      **THE COURT:**  And you say you've given them some other

21  documents that cover other subjects.

22      And you're pushing back on the discipline.  I understand

23  that, and we can talk about it later if we have to.

24      But just everything else.  If you had a policy regarding

25  personal stuff, like laptops and cell phones and things like

 1  that, did they get something on that?

 2      **MR. STEPHENS:**  Correct, Your Honor.  We produced documents

 3  that relate to policies.  We produced documents that relate to

 4  trainings.  We produced an employment agreement for Kenny Wang

 5  as an example of what the employment agreement would look like.

 6      **THE COURT:**  Yeah.  I just wanted to see, though.  They

 7  broke it down, "including."

 8      Now, you probably shouldn't say "including" because that

 9  sounds civil and not criminal.  But, okay.

10      They've got -- for example, I'm just looking at 2.  Do you

11  want to take a look at -- do you have these where you can look

12  at them quickly?

13      **MR. STEPHENS:**  Yes, Your Honor.

14      **THE COURT:**  Great.  Take a look at 2.  And you'll see that

15  it's policies concerning various ways that you could store

16  information.

17      If they had policies regarding that during the period you

18  thought was relevant, did you give those up?

19      **MR. STEPHENS:**  Correct.  We produced documents regarding

20  secure and confidential information actually, I think, in a

21  little bit broader time period.

22      We produced policies related to employee use of Micron's

23  systems and devices, including USBs and SharePoint.

24      **THE COURT:**  Okay.

25      **MR. STEPHENS:**  We produced agreements signed by Kenny Wang

1  related to the protection of Micron's confidential information.

2      **THE COURT:**  Okay.  I just want to break down the little

3  parts of it, because they kind of broke it down.

4      So training, you said you gave them something on training.

5  All right.

6      **MR. STEPHENS:**  Correct.

7      **THE COURT:**  Then you've got -- that was 3.

8      Now I'm at 4.  Is there anything concerning -- and it may

9  be that you don't have anything concerning what they can bring

10  from outside, which, frankly, may not have anything to do with

11  what you're trying to keep secure.

12      But they wanted that.  I just don't know whether you gave

13  them anything in that category.

14      **MR. STEPHENS:**  Your Honor, we produced four

15  policy/procedure documents containing directions regarding

16  bringing materials from former employees.

17      **THE COURT:**  All right.  Okay.  Okay.  Admirable.

18      And then, as to 5, that's the other side.  Was there --

19  and I don't even care how many you gave them at this point; but

20  just, did you give them documents that contained a policy

21  regarding what they can take when they go?

22      **MR. STEPHENS:**  On Number 5, we produced multiple

23  employment agreements signed by Kenny Wang which lays that out.

24      **THE COURT:**  Fine.  Okay.

25      And then we're skipping 6.  6 is not anything you gave

them anything on yet.

     And we're at 7.  We talked about enforcement.  You said you gave them some of that but that you did not give them disciplinary actions.  Okay?

     Do you even know whether anybody was ever discovered to have violated a policy, let's say, during the three years from October 1 to whatever that September 27 of '18 -- '15?

     **MR. STEPHENS:**  I don't, Your Honor.  But obviously, it's a very large company; global operations; a lot of employees.  And that's part of the problem with the request.  Right?

     **THE COURT:**  Yeah, it is.  So I was trying to figure out if there was any way that it could be narrowed just so that there was something that you could say you gave them in that category as well.  But I think no.

     Mr. So-and-so says:  Hey, don't you have all these things in one place in HR?

     Probably not.  You probably have a bunch of personnel files.  But I don't know.  Maybe you do.

     **MR. STEPHENS:**  Your Honor, if I could, because this kind of does dovetail with Number 8.  So for the -- what you're talking about as far as discipline goes, that's going to touch on other objections that relate to specificity, relevance, admissibility, and privilege.

     **THE COURT:**  Okay.  Well, if you didn't name an employee and you just said -- that's why it might not be privileged to

 1  say:  Okay, we had two employees that did X and Y, and this is

 2  what happened to them, and it's somewhere that could be

 3  redacted.

 4      But it becomes unwieldy to a certain extent, I can

 5  understand.  So let's just leave that aside.

 6      Here's what my ruling is going to be at least at this

 7  point.  Okay?  That as to 1 through 5 and 7, that documents of

 8  the nature already disclosed that may be different than the

 9  ones that were disclosed and go as far as the later date that

10  we talked about, which is just the period -- you say you may

11  have even done earlier than October 1 of '15.  But -- if you

12  did, fine.  But the period we're talking about is October 1 of

13  '15 to September 27, '18.  If there are documents of the nature

14  that you already gave and are different in a period that

15  extends beyond when you wanted to stop, which was April 26 of

16  '16, then I will order that those be delivered as well.  Okay?

17  So I've expanded the period, but not the nature of the

18  documents that you gave.

19      Mr. DiCanio?  I'm sorry?  Did you want to be heard?

20      **MR. DiCANIO:**  Your Honor, something unique to doing this

21  from home.  I was telling my son not to come into my office.

22      **THE COURT:**  Oh.  Oh, that's okay.  I thought that you

23  maybe were saying:  Oh, can I weigh in for a moment before

24  you --

25      **MR. DiCANIO:**  No.  Mr. Sloan is doing fine.  He doesn't

1    need my help.  Thank you, though.

2        **THE COURT:**  Oh, okay.  Because in one case we had

3    recently, the person's cat walked across, and they had to pry

4    the cat off of their lap before they could keep going.

5        **MR. DiCANIO:**  I apologize for interrupting, Your Honor.

6        **THE COURT:**  No, no.  You didn't.  I just wasn't sure.  I

7    didn't want to leave you out, although I didn't want you also

8    to tag team up on Mr. Sloan but --

9        **MR. SLOAN:**  Mr. Stephens.

10       **THE COURT:**  Okay.  So that's that ruling.

11       And I am still thinking about the discipline, but I have a

12   feeling it's just too hard to do because it's not in a discrete

13   document.  You're going to have a personnel file that you'd

14   have to find and see if somebody did something, and you'd have

15   to see what was done to them.

16       And it's not the kind of thing that's distributed.  The

17   other things are distributed.  If they didn't distribute them,

18   they don't even count.  If nobody got them, then that's even

19   worse.  That's like Step 1.  You have a great policy.  You

20   didn't give it to them.  And then, when you gave it to them,

21   you didn't enforce it.  So, okay.  So at the moment, that's the

22   ruling on those.

23       Now I'm going to backtrack to 6.  Okay?

24       After 1 to 7, I think the plaintiff -- I'm sorry -- Jinhua

25   just has a lot more trouble.  1 to 7 were the ones that it

1  looked like they had a better shot at.

2      Number 6 -- which let me just go back to that -- was

3  asking for drafts.  That's going to be denied.

4      And then revisions that it made all the way up to the

5  present time.  Now, I want to talk about revisions.

6      To the extent there were revisions during the time period,

7  they'll be reflected in the documents that were given because

8  they're going to give you whatever the policies are for the

9  full time period and you can look and see if they changed over

10  time.  But as to things that happened afterwards -- now, let's

11  just see for a moment.

12      So to the extent there were revisions, they're already

13  covered in 1 to 5 and 7.  Drafts, I'm not going to give you as

14  I don't think they're relevant.

15      And then let's see.  And this will be -- all of mine will

16  be for this expanded period, I'll just say, so that I don't

17  have to keep saying that.  But I'm not granting it because

18  I think that to the extent it's relevant, it's already covered.

19  But, again, I just want to make clear that the time frame that

20  I'm granting those earlier requests for, in limited fashion, is

21  the time frame asked for by Jinhua.  Okay.

22      **MR. SLOAN:**  Your Honor, could I just be heard for one

23  moment on that?

24      **THE COURT:**  Yeah.  Very brief, but go ahead.

25      **MR. SLOAN:**  Your Honor, the one reason that I think that

1   there's a grounds to extend it beyond September 2018 is that to

2   the extent that they made additional revisions to their

3   policies, that could be, again, further evidence that -- and

4   acknowledgment, essentially, that they had failed to take

5   adequate precautions before.

6       **THE COURT:**  I thought you were willing to cut that one off

7   at the date of September 27, 2018, although you didn't

8   originally ask for it.  I could be incorrect in that.

9       But I have a view about things happening after the cat's

10  out of the bag.  Okay?  So -- and that's this:  First of all,

11  although Rule of Evidence 407 does not necessarily dovetail

12  perfectly with this idea because ordinarily it's applicable to

13  defendants and not alleged victims, shall we say, but there's a

14  policy underlying 407 and the case law that may have given rise

15  to it that I think is equally applicable here -- at least to a

16  significant extent the same -- which is that you don't want to

17  discourage remedial action.

18      That, oh, my goodness; hold this against me if I don't

19  fill in the big hole that the plaintiff fell in; or I better

20  not change anything because then it's not going to work out and

21  somebody will accuse me of not really doing a good job on my

22  trade secret.

23      Furthermore, the real question is whether -- not after

24  somebody's already done something.  So let's say that you have

25  great bank security, but then somebody does something that's

1   really major action, out of line, and you realize:  Oh, I

2   better put bars on all the windows.  Okay?

3        In other words, once something has been done that's

4   outside of what you might reasonably expect, you might then

5   take extraordinary measures, and then we have a 403 issue about

6   that.

7        And so I think under those circumstances, the

8   *ex post facto* changes are not -- either, one, they run afoul of

9   a policy at least that's recognized in 407, if this exact event

10  isn't covered, and also runs into a 403 about jurors confusing

11  what could be reasonable in the first instance with

12  extraordinary measures that somebody has to take after someone

13  commits a crime.

14       So that's the Court's thought on that one, and that's why

15  I'm granting 6.

16       So then we're up to 8, which I know Mr. Stephens is

17  concerned about because he kept wanting to talk about it when

18  we were talking about 7.

19       **MR. STEPHENS:**  That's correct.

20       **THE COURT:**  But I think that 8 is -- again, it's broad.

21  It runs into an investigation.  Yeah, it overlaps, but it's

22  worse than 7.  Okay.

23       And so under those circumstances -- and I just want to

24  look at a couple of notes I made, just to make sure that I'm

25  not going awry here or, at least in my own mind, I'm not going

1   awry.

2                      (Pause in proceedings.)

3        **THE COURT:**  We know that Micron knew about whatever the

4   wrongdoing was at least by the time they filed their civil

5   complaint.  That was back in December of '17, I believe.  And

6   then the conspiracy was alleged to have gone on for about

7   ten months beyond that, almost ten months after that.

8        But if we're dealing with after-the-fact investigations,

9   all of that, it just seems to me, first of all, that we don't

10  have any particular document identified for purposes of our

11  criminal rules.  And it just seems that it is too -- it's just

12  too broad.  So it's just not specific.  And it runs, at a

13  certain point, afoul of what I was just talking about,

14  *ex post facto* material, though there is a period that's before

15  and that at least would be covered by -- well, it wouldn't be

16  covered by -- the investigation isn't covered by 1 to 5 and 7;

17  so I take that back.

18        9.  I think that the idea of what Micron thought about

19  whether they had any trade secrets is totally irrelevant.

20  Their view of whether they've got a trade secret or not,

21  they're not a party to this case.  And they're going to have to

22  prove they had trade secrets.  Well, they aren't going to prove

23  it.  They're going to have to give the U.S. Attorney whatever

24  information will prove it.  But you don't have any admissions

25  here by Micron in that sense.  So I just think that it just

1  doesn't -- it doesn't really fly.

2      Plus, there could be somebody at Micron that thought

3  something wasn't a trade secret when it was.  So there's just a

4  piece of paper with a bunch of people that work there.  So I

5  just didn't think it was relevant at all.

6      **MR. SLOAN:**  Your Honor, if I may, I understand.

7      **THE COURT:**  Go ahead.

8      **MR. SLOAN:**  And our thinking there was that, you know, as

9  you said, if there's someone at Micron who said that --

10 you know, took a position that something was not a trade

11 secret, we think it's -- for instance, we think it's very

12 likely that the Government is going to call witnesses from

13 Micron to testify.  And while I understand that, in general,

14 purely impeachment material is not admissible or cannot be

15 produced under Rule 17, there is a body of case law, including

16 the *Reyes* case which Mr. Stephens noted earlier, that says that

17 in circumstances like this where there's, you know, likely to

18 be impeachment material, the Court can examine that information

19 *in camera* and have it available in case the Government calls a

20 Micron witness and there is valuable impeachment material in

21 those documents.

22     **THE COURT:**  If there was some very narrow description of a

23 document, maybe, maybe.  But here, it's just, you're throwing

24 in their lap:  Just tell me anything at all that you've got.

25 Just hand over any documents you've got about any investigation

or anything that somebody may have commented about back at the

shop about this case or the materials that are now alleged to

be trade sec- -- it's just too broad and unspecific to apply

what I'll just call an unusual and extraordinary remedy.  It

just doesn't cry out for it here.

      And so I understand what you're saying, but I just decline

to collect that, look at it, and then decide whether there's

impeachment or not or have them try and figure out what would

qualify as something, and who speaks for Micron, and how high a

level person and, et cetera.

      So, all right.  Now, 10 is sort of like -- all right.  Is

this this idea that it's not a trade secret if you

reverse-engineered it or bought reverse-engineering from

somebody of what you say is a secret?  Is that supposed to be

what it is, or is it -- I'm not sure.

      **MR. SLOAN:**  Your Honor, it's a little more complicated

than that.  We wouldn't take the position that something that's

reverse-engineered could never be a legitimate trade secret.

But the standard for determining what's a trade secret under

the statute is whether something was, you know, known in the

industry and/or reasonably ascertainable by someone skilled in

the art.

      And to the extent that they were able to -- Micron was

able to develop their technology through reverse-engineering,

that could be evidence -- it could be evidence -- that this was

1    reasonably ascertainable and, therefore, not entitled to

2    protection as a trade secret.

3        And, Your Honor, I will tell you that we -- so I think we

4    mentioned in our papers that the Government apparently served

5    some type of process on Micron.  We assume it's a grand jury

6    subpoena, although we don't have the subpoena.  And Micron

7    produced a substantial amount of documents to the Government.

8    We have received a substantial amount of documents.  I think

9    the Government has represented that we received all of those

10   documents.

11       There were some documents that are called "Competitor

12   Analysis Reports" and "reverse-engineering Reports," and they

13   are very pertinent to this very question as to whether or not

14   something could be considered a trade secret, whether or not

15   the technology was reasonably ascertainable.

16       And we -- of course, we don't know what that subpoena

17   asked for.  We don't know whether Micron has produced

18   everything that is relevant to that determination.  And we're

19   just asking for all of those documents of the nature, some of

20   which they've already prepared, and I do think they are

21   relevant to that question.

22       **THE COURT:**  Are you saying they've already turned over to

23   the Government this kind of information?

24       **MR. SLOAN:**  There are some documents like that that have

25   been turned over to the Government and the Government, in turn,

produced to us, yes.

**THE COURT:**  Fine.  As *Brady* material; is that right?

**MR. SLOAN:**  They -- they turned it over.  Whether it's Rule 16 or *Brady* material, they didn't indicate exactly what it was, but they've turned it over to us.

**THE COURT:**  Well, if your position is that if it's easy to figure out, then it isn't necessarily a trade secret; it's not out there, at least at the moment, according to Micron, which they are either going to give the Government information on, or not, and the Government will either have; that at least generally the public doesn't know about this.

And then if they spend a lot of money to figure out how to reverse-engineer it, that doesn't necessarily mean that it's not generally a secret.  But if it could be argued, it sounds like you got it.

In other words, if the Government's served something on them that they, in an effort to cooperate with the Government as opposed to your client, gave to the Government and then the Government gave you what, arguably, might be something that you could argue, then I think you've got it already.

So I don't even see where you've shown that you can't, and haven't, gotten it elsewhere, I guess is the idea.  You're just saying:  Hey, did you give everything to them?  We don't trust them.

Maybe they held back on the Government.  Okay.  If they

1   held back on the Government, what do you think they're going to

2   do with your client?

3        **MR. SLOAN:**  Your Honor, I'm not suggesting that they

4   improperly held anything back from the Government.  We don't

5   know what the Government asked for.  We know that we've seen

6   some documents like this.  We don't know exactly why they were

7   produced.

8        To the extent that there are other documents like this

9   that would be relevant to this determination, we would like to

10  have them.  And we don't -- as I said, we don't have

11  the Government's grand jury subpoena; so we don't know what

12  they requested.

13       **THE COURT:**  Okay.  But they did give you something that

14  looked like reverse-engineering?

15       **MR. SLOAN:**  There are some documents like that, yes,

16  Your Honor.

17       **THE COURT:**  Okay.  So it sounds like they asked for

18  something that would at least overlap in some way with this and

19  that you got them.

20       And if you really wondered -- I don't know what kind of

21  relationship you've got with Ms. Vartain but -- you could say:

22  Hey, why did you give this stuff to us?

23       And then see if she says:  Oh, I'm not going to tell.

24       Okay?  Maybe she'd tell you why she gave it to you.  Maybe

25  it isn't a top secret.

1    In any event, I think it's very broad and asks for

2  analyses.  I mean, this isn't just something that's a given.  I

3  just don't see it, for all of the reasons that I said, and I

4  denied that.

5    And then we would have Number 11, which is kind of the

6  same thing, essentially.  Did you pay anybody to give -- if

7  they did the work already, did you pay them to get their

8  reports?  And, again, it's -- let me ask a question.

9    These requests are all going to DRAM technology.  Now, is

10 every DRAM technology -- I don't know -- component that Micron

11 uses alleged to be a trade secret here?  Do we know?

12    For example, let's say that somebody reverse-engineered

13 something that -- I don't know -- Samsung had, or what have

14 you, and it has to do with DRAM technology and maybe Micron got

15 their hands on that report in some way.  Does that mean that

16 that was what they're claiming is their trade secret, or it's

17 just in kind of the same area of technology?

18    **MR. SLOAN:**  No.  Your Honor, what we're specifically

19 seeking here -- and perhaps it's not as clear as it could be.

20    TechInsights and Chipworks are companies that basically

21 are in the business of buying semiconductors and other types of

22 technology, chopping it up, taking it apart, and providing

23 reports to companies to explain what the structure of these

24 devices are for the purpose of reverse-engineering.  And it's

25 something that we understand that Micron purchased.

 1          And, again, the presence of those -- you know, those

 2     reports would help us potentially show that these were not

 3     actually trade secrets because they were so similar to the

 4     information that they obtained from publicly available reports;

 5     therefore, they would be reasonably known under the statute.

 6          **THE COURT:**  All right.  Let's say they're publicly

 7     available reports.  Why can't Jinhua buy them?

 8          **MR. SLOAN:**  Well, Your Honor, I guess the issue is, there

 9     are all kinds of reports.  To know what reports Micron itself,

10     what their engineers were referring to and looking at would be

11     relevant to determining whether or not their designs were

12     really entitled to trade secret protection.

13          **THE COURT:**  Well, my question was:  When you use other

14     companies DRAM technology, as a phrase, or just DRAM

15     technology, is that a phrase that's broader than what's claimed

16     as the trade secrets in this case?

17          So they're off reverse-engineering on some other aspect of

18     DRAM technology.  It doesn't even have anything to do with what

19     they're claiming is a secret here possibly.  That's kind of

20     what I'm asking.  Is that phrase broader than the claimed

21     secrets?  I don't know anything about it.

22          **MR. SLOAN:**  Your Honor, it could be.  And we would

23     certainly be willing to modify this to make clear that we're

24     only looking for reverse-engineering reports that were used by

25     their engineers in the production of the trade secrets which

1  are at issue in this litigation.  We'd be happy to modify it in

2  that fashion, Your Honor.

3     **THE COURT:**  Okay.  Now, even if you did, I still see a

4  problem with it.  First of all, it's not specific at all and it

5  leaves them to trying to figure out:  Gee, we

6  reverse-engineered this or we bought a report and then:  Hey,

7  Harry, did you put this into this?  Or did somebody do that?

8  Or is it --

9     I think you have to go through thought processes to

10  identify the document.  There's no indication that there's an

11  easy way to just have all this in one identified document.

12     And so I'm going to sustain as, again, these may be things

13  that in a broader allowed discovery exercise, you could show

14  would be something you might be able to get, but not in the

15  confines of, regrettably, the criminal action.

16     And Number 12 is just -- it's, like, even worse in a way.

17  It really sounds like a fishing expedition.  I just -- whether

18  you're sure of the time frames or whatever is going on here.

19  Any attempts to reverse-engineer.

20     And then any licensing agreements.  Now, that sounds like

21  a separate subject.  Licensing agreements were not covered in

22  1 to 5 and 7 because, as I mentioned earlier, those were kind

23  of in-house types of ideas.  What do you tell the people that

24  work here, since they're the ones that are alleged to be the

25  initial culprits?

1        And then we get to licensing.  Now, sure, if you license

2   particular technology and you don't tell those people "By the

3   way, this is secret; don't give it to anybody else," that could

4   be a problem.

5        And if there were licenses of this technology, just

6   whatever's claimed to be a secret here -- because that's not

7   something where you're just saying generally to your employees:

8   Look, if it's got anything to do with DRAM, you don't give it

9   to anybody else.

10        This is, more or less:  Here's what we're giving you.  And

11   then:  Have you told them they can't use it in any other way,

12   except as allowed in the license, and they can't disclose it?

13        I don't know if they licensed any of this stuff.  If they

14   did, then it's possible that that could be relevant.  So you

15   would say any licensing agreement covering the secrets or any

16   licensing agreements licensing the right to use what you're

17   calling a secret here.  I don't know.

18        We have certain procedures that are a totality, but

19   I think they're also alleging that there's certain subparts

20   that may free float on their own as being protectable.  And

21   then others are only protected because it's a composite of a

22   procedure or process in some way.  So that might be.

23        I don't think the second aspect -- not the attempts to

24   reverse-engineer.  I'm not sure why you collected these up in

25   the same number, but they just seem very different to me.

1    I don't know.  Is 25nm DRAM technology, is any of that, if

2    it is licensed, going to include alleged trade secrets here?

3    Or could they have licensed something in that category that

4    doesn't have any of the alleged trade secrets?

5      **MR. SLOAN:**  Well, Your Honor, this is specifically focused

6    on Elpida's 25-nanometer DRAM device.  And that is one of the

7    devices that the Government has claimed is encompassed within

8    Trade Secret Number 1.

9      **THE COURT:**  Well, if they claim that, then all right.

10   Let's look at it.

11     Micron bought, or whatever, Elpida.  When did they buy

12   them again?  I don't know.

13     **MR. SLOAN:**  I think it was in July of 2013, though it

14   could be '12.

15     **THE COURT:**  They picked up a couple of companies.  They

16   picked up Elpida first and then some other company after that.

17     But, okay.  So let's say they get Elpida.  If this is

18   Elpida's technology that Micron essentially buys, if it had

19   already been sort of put out there in some way that wasn't

20   protected, then I guess Micron bought technology that wasn't a

21   trade secret, arguably.

22     That's your position; right?

23     **MR. SLOAN:**  Correct, Your Honor.

24     **THE COURT:**  Okay.  So is it your thought -- because you

25   said "between Micron or Elpida and third parties."  So is it

1   your understanding it was just Elpida that essentially might

2   have licensed this stuff, not Micron, or do you think they both

3   had licenses?

4        **MR. SLOAN:**  Your Honor, we were trying to determine

5   whether there are licensing agreements.  We don't know.

6        **THE COURT:**  Well, if you asked for any licensing

7   agreements within the time frame that I talked about earlier,

8   that would not encompass -- when did they buy Elpida again?

9   I'm sorry.  Because here's your problem with Elpida.  They

10  could go back into forever.  And I don't know when they

11  developed this stuff themselves, so whether there would even be

12  a starting point.

13       But in other words, if you wanted to try to say Elpida

14  already gave it away before Micron ever bought it, that could

15  have been from whenever they developed it until they gave it to

16  Micron.  I don't even know what those dates are.  So I just --

17  I can't tell if there's any way that you could actually put

18  some kind of a cap on any of this.

19       Do you know, Mr. Stephens, whether there are any licensing

20  agreements for 25nm DRAM technology?

21       **MR. STEPHENS:**  I do not, Your Honor.  And, again, that

22  then ties back into what we emphasize in our reply brief, that

23  it's the mere hope that they might find something that might be

24  relevant.  And *Reyes* and *Collins* and *Johnson* and all those,

25  particularly *Johnson*, use that as a basis to quash a subpoena.

1    **THE COURT:**  Yeah.  I mean, it's a little different than

2    what you did with respect to your employees because, again, I

3    don't think it's really necessarily tied to the specific

4    criminal conduct.  So if something wasn't a trade secret as of

5    the time that someone stole it -- they didn't steal a trade

6    secret; they just stole information -- then I guess that could

7    be a defense.  But if you don't know that there's a licensing

8    agreement even out there, then I think you run into a problem.

9    And, of course, with the criminal discovery, you don't

10   even get to ask all kinds of stuff that you'd like to ask in a

11   civil case.  Maybe it would have been better if Jinhua just

12   went ahead with civil discovery.

13   But in all likelihood, they didn't just say, "Go ahead;

14   use this stuff any way you want in perpetuity."  They would

15   have been protective of it.  And so it does sound like you're

16   just hoping there's something out there; that if you throw a

17   big net out, maybe you'll encompass something that you weren't

18   really thinking was likely but might be there.

19   There's just no indication that they licensed, that Elpida

20   licensed, that you know of any anybody that got this

21   technology, anything to even indicate that there's something

22   out there.

23   Having thought it all through and recognizing it could be

24   relevant, I still think inadmissible, but I think that it's

25   just not specific enough.  So, okay.  Sorry.

1      Okay.  Then 13 is -- I think this is like 9.  That's what

2  I wrote.  Even though Jinhua is saying, "Hey, these people are

3  really a party," no, they're not a party.  They're the victim

4  alleged.  They're operating with the Government.  And whether

5  it was their idea or not to start this investigation and

6  indictment really doesn't matter, which is going to also bear

7  on some of these other.  So 13, no.

8      14, what they thought the value was of their trade

9  secrets.  Now, for this purpose, again, there is some

10  allegation, by the way, in the complaint -- or the indictment,

11  rather.  But that's the Government's statement about what they

12  think it is.

13      Micron, again, as far as I'm concerned, at least at this

14  point, what they think the value is really doesn't matter.  And

15  if we ever got to damages or restitution, yes, then it's going

16  to be important.  But at this point we've just got a criminal

17  case.  We don't have damages in a civil case.  We would have

18  restitution, but that's only after liability -- not

19  "liability" -- that's only if they get convicted -- or you do,

20  rather, not them.  You do, your client.

21      **MR. SLOAN:**  Your Honor, can I address this briefly?

22      **THE COURT:**  Yes.

23      **MR. SLOAN:**  So as you said, the Government in the

24  indictment alleges that the value of this is somewhere between,

25  I think, 400 million and 8.75 billion dollars.  The Government,

we assume, is going to try to prove that up at trial, something
like that.  They've released expert reports that I won't get
into, but they are going to presumably allege that these
alleged trade secrets have a lot of value.

     To the extent that Micron itself, the alleged -- the
complainant, the alleged victim -- whatever you want to call
them -- did their own analysis and determined that these
products were actually worth far less than that, that would
certainly be something that would be very relevant for a juror
to know, I would think, because --

     **THE COURT:**  Well --

     **MR. SLOAN:**  -- it directly contradicts one of
the Government's main claims.

     Now, we're not asserting that that is an independent
element of the offense; but it is certainly something that
would be relevant to the jury's determination, both of whether
or not the Government's and their experts' purported claims
about the value are accurate, but that also goes, of course,
to, you know, the whole alleged motivation to this.

     **THE COURT:**  Well, I think their motive is highly
irrelevant.  I'll tell you why that all is when we get to those
other things.

     But let's get back for a moment to Micron.  Whether they
did an analysis, what it's incorporated in, again, you're back
to, there's no specific document you know about.

1       By the way, when the expert gave his or her opinion -- and

2   I don't know what their sex is.  But anyway, you got an expert

3   report.  Did that expert rely on facts that were fed to the

4   expert from Micron, or did they just do it on their own, like

5   "I'm familiar with this area and this is what this kind of

6   stuff is worth out there"?

7       I don't know that it would change my ruling any, one way

8   or the other, but I'm just curious.  A lot of times experts

9   take facts as a given that they're provided, and then they spin

10   off it.  Is this one of those reports, or is it more just their

11   own evaluation of the market?

12       **MR. SLOAN:**  Your Honor, I think it would be fair to say

13   probably that it's a little of both.

14       **THE COURT:**  Okay.  Fair enough.  So they take some raw

15   data or information, and then they come up with their expert

16   spin on it.

17       Again, as I say, maybe Micron concocted a -- or not

18   "concocted," but Micron calculated -- I'm sorry.  You've got me

19   thinking they've got bad motives.  Okay.  So they calculated a

20   number.  But you have no reason to think that.  I mean, there's

21   nothing to even suggest there's anything out there.

22       And then that goes back to, kind of, get your hook and

23   line and a worm on the end of it, or maybe a fancy fly, but

24   nonetheless.

25       So I think that that one also just isn't going to fly.  I

1  understand why you'd like to have all this stuff, but it's not

2  going to make it, at least in the context of this particular

3  proceeding.

4       I have a question about 15.  So let's see.  This is one

5  where you wanted to have a list of the equipment and tools that

6  they used to make this device in-house at Micron.

7       First of all, you can't make them create a list.  Okay?

8  So I don't even know that a list exists.  But I think Micron

9  said that you already have the information.  That's what they

10  were saying in their motion to quash.

11       So let me ask Mr. Stephens.

12       How did they get that info?

13       **MR. STEPHENS:**  Oh, I think the point, Your Honor, was

14  there -- this had come through Rule 16 discovery from

15  the Government at some level.  I don't know if it's going to be

16  all of what's requested.

17       And we also have additional objections to the request,

18  including just kind of the understanding of the way that a list

19  would work.

20       But for some of the same reasons that the Court has

21  recognized on specificity, this, again, is a request where

22  they're seeking "all documents reflecting."  So it's very

23  broad.  There's the mere hope that it might be something that

24  potentially could be helpful.

25       And you're going to run into some relevance issues because

1    manufacturers may, for example, use different tools in

2    different fabs.  And this is a process trade secret, which is,

3    a lot of it's more like recipe based.

4         **THE COURT:**  You were saying that the equipment itself is a

5    trade secret or not?

6         **MR. STEPHENS:**  I think what -- and I don't want to speak

7    for Mr. Sloan, but I think that what they're trying to get at

8    is what the final list of tools are.  And if I saw the way that

9    they argued in their papers, they're saying if that final list

10   doesn't match the final list that Jinhua was using, poof, it's

11   not a trade secret.  And just from a technical standpoint, we

12   vehemently disagree with that assumption.

13        **THE COURT:**  I don't think that's their argument.  I think

14   their argument is, "We didn't use your trade secret because we

15   couldn't."  In other words, "We don't have the" -- "Our plant

16   is different than your plant, and the nature of these

17   particular secrets is stuff that if we don't have the same

18   plant that you have, then we can't make it, and so we didn't

19   make it and we didn't use it.  Somebody may have stolen it.

20   But then we thought Samsung was much more exciting and usable,

21   and we went with that," or whatever the story is.

22        But it's not -- it's not going to be that you don't have a

23   secret.  This argument is different.  All the other stuff that

24   we've been talking about pretty much up to this point has been,

25   you don't have a secret.

1        So, okay.  You could say:  Our guy took it.  But he wasn't

2    even our guy.  It was the other guy's guy, and then, of course,

3    he came to work for us.

4        And so then the question is what he did with the stuff

5    when he came over.

6        But anyway, there are all these steps.

7        And even if he brought it, so what?  We couldn't use it.

8    So we said:  Sorry, Mr. Chen, but we can't use it.

9        So that's kind of their point for this.

10        The problem is that I don't know that there's ever a final

11    list of equipment.  You got equipment and you're using it.  And

12    unless the equipment itself is a trade secret that somebody is

13    claiming, then you got a machine here and you got a plant there

14    and you're doing whatever you're doing with it.  It's like

15    saying, "Give me a picture of every piece of your equipment,"

16    and they take a picture of it.

17        So certainly, once somebody gets on the stand, then

18    they're going to have to do it.

19        If you think that there's a good chance, somehow you've

20    got a fly on the wall over at Micron that told you what the

21    equipment is, then you can ask those people "Don't you use a

22    such-and-such?"  Or if you don't know, "Do you use a

23    such-and-such?"  And then you say, "Oh, well, we can't use

24    that."  And you've got somebody who says that.

25        But for starters, it just doesn't seem like it's something

1    that's a document.  And you can't ask them to bring all their

2    equipment in.  So, okay.  I mean, you could, I guess, subpoena

3    some of their tools for the trial.

4        All right.  So then you have your documents reflecting

5    their policies and procedures regarding recruiting employees.

6    Now, why is that relevant to any issue here?

7        **MR. SLOAN:**  Your Honor, it's relevant because

8    the Government is going to argue in their opening statement, we

9    predict, or during trial that one of the things that UMC and

10   Jinhua did was purposely recruit employees from Micron for --

11   you know, so that they could steal Micron's alleged trade

12   secrets.  And they will point up the fact that these various

13   employees were recruited.

14       And I think it's -- again, I think it's very relevant for

15   the jurors to hear that, yes, they did bring over -- I mean, we

16   dispute that they were sort of recruiting for any illicit

17   purpose, obviously; but, yeah, they did bring some people over

18   from Micron.  There's nothing inappropriate with that.

19       And, in fact, we think that these documents that we're

20   requesting will show that Micron did some of the same things;

21   that it's a common practice in the industry to recruit people

22   from competitors, other companies; and that there's nothing

23   inappropriate or untoward about that.  And, again, I think that

24   is relevant for a juror's consideration.

25       **THE COURT:**  Okay.  Then let's put it this way.  It's just

1    too broad and not specific and easy to prove up if your point

2    is as follows:  Everybody does it.  Just because you hire

3    someone away, it goes on all the time, people are out trying to

4    get the best talent they can, et cetera, et cetera.

5        Then you've got somebody from Micron on the stand.

6        "Hey, you recruit, don't you?"

7        And then that's it.  They're not going to say "no" because

8    you say everybody does it.  So then that won't be a problem.

9    And if you were trying to look at their specifics and trying to

10   say, "Look, you're really cheating here," that's not relevant

11   for this particular purpose.

12       Okay.  So then we go back to -- "on," I guess, not "back."

13   Heaven forbid.  We're on to 17.  So this is more recruitment.

14   But why is it different than 16?  I mean, it's more specific,

15   who you tried to get people from, but isn't it covered by 16?

16   In other words, the first is anybody you tried to get from

17   anybody, and this is anybody you tried to get from specific --

18       **MR. STEPHENS:**  Yeah.  16 is more dealing with sort of

19   policies and procedures; whereas 17 is dealing with --

20       **THE COURT:**  Oh, the actual doing it.  Okay.

21       **MR. STEPHENS:**  Correct.

22       **THE COURT:**  I see.  I see.  All right.  I'm sorry.  You're

23   absolutely right.  One is:  What's your idea about getting

24   people from other companies?  The other is:  Who did you

25   recruit or try to recruit?

1        And, I mean, can't you just imagine all the things that

2   this could possibly cover?  And asking someone to come up with

3   and sending feelers out.  And my goodness.  It'd just go on

4   forever.  And it's not specific at all.  So those two go

5   together, I guess.

6        And then we have 18.  Now, this gets to your whole idea

7   that somehow -- now, wait a minute.  Let me just double-check

8   if this is the one or if this is a different one.  Just a

9   second.

10                        (Pause in proceedings.)

11        **THE COURT:**  Yeah, Jinhua has some idea, that they want to

12   try to present, that Micron is forcing this prosecution because

13   they will get a financial benefit out of getting rid of Jinhua

14   and UMC from whatever the market is.

15        Now, let's just look at that for a minute.  People can

16   have a lot of reasons why, for example, they just bring a

17   lawsuit themselves.

18        You can say so-and-so absolutely hates the defendant and

19   they have a great case against them.  Okay.  Where does that

20   go?  Nowhere.  All right.

21        Or somebody is suing somebody because they are infringing,

22   let's say, their patent; and once they get rid of them, there

23   won't be any other competitors in the field.  Fine, as long as

24   they can prove the case.  They don't have to be doing this with

25   a mental state that came out of a convent.  There are pragmatic

1   reasons and economic reasons.

2      People say:  Oh, I'm just suing over the principle of the

3   matter.

4      No, no, they're not.  There's some economic benefit in

5   most cases to doing it.

6      And so here, unless you want to say that somebody's lied

7   about something and that you can show it in some way by the

8   motivation -- which wouldn't be brought out by any of what

9   we've got here.  Motive just doesn't come into play.

10     So if somebody actually said "No, we kept everything

11  really secret" and you're able to show they didn't, you want to

12  say, "Yeah, you did really know.  You knew these weren't

13  secrets, but you just wanted to get rid of our people and

14  competitors," maybe you could do that, but not through this

15  kind of an idea.  It just doesn't work.

16     And let's just assume that they're not trying to extort

17  something out of the Government.  People come all the time to

18  the Government with things they're concerned about.  Sometimes

19  they come to the federal government because they're complaining

20  that the local D.A. won't prosecute anything.  So, I mean,

21  they're just all kinds of reasons.

22     I just don't see it.  So without some other very specific

23  showing that this would come into play, I'm just denying their

24  communications.

25     And then the same thing on 19.

1      And the same for, really, 20 and 21, which is just saying

2  that they've looked into the market and are figuring, yeah,

3  they want to sell there.  Everybody wants to sell.  It's a big

4  market.  And they wanted Jinhua to work with them until they

5  found out they'd already stolen the secrets, according to them.

6      Okay.  Fine.  You may want to bring up at some point that

7  they tried to recruit Jinhua.  I don't know where it's going to

8  fit in, but it may.

9      But just going on this kind of idea of just "Let's see if

10 you've got anything out there," no, that's not going to work,

11 and it doesn't really seem to be relevant, at least right now.

12     So I think if you can ever show that somebody is doing

13 something in the course of the case, other than simply wanting

14 to have a wrong righted because of a motive that they've got,

15 then go with it.  But at least for now, it just seems to me

16 that these other -- all of this stuff is just all of the same

17 ilk.  It really doesn't even appear to be relevant, and it's

18 just not specific at all.  Just any document you've got

19 reflecting a conversation you had with the U.S. Attorney here

20 or a prosecutorial authority in Taiwan, it's just too broad,

21 too non-specific, too too-too-too, fill in the adjective.

22     So I'm not going to --

23     **MR. SLOAN:**  Your Honor --

24     **THE COURT:**  -- allow it.

25     **MR. SLOAN:**  -- I won't belabor the point.

1        I understand --

2        **THE COURT:**  Make your last record on it.  But remember, I

3   know what you want to say.

4        But if you don't have something like this:  Somebody is

5   accused of, let's say -- we'll just use simple crimes.

6   Okay? -- embezzlement.  And the defendant says:  No, I didn't

7   embezzle a dime.  Okay?  That money went out somewhere else.

8   It had nothing to do with me.

9        And you want to show whatever amongst your circumstantial

10  evidence this person suddenly has a major debt they have to

11  pay, and this could be a reason.

12       Otherwise, someone would say:  Why would I do it?  Why

13  would I embezzle?  I have all the money in the world.

14       Oh, no, you didn't, because didn't you just have this big

15  financial loss?

16       All right.  But nobody is saying here anything other than

17  "These are our trade secrets."  If the jury doesn't find it's

18  their trade secret, fine.  If the Government can't prove your

19  client had anything to do with whatever these guys were that

20  jumped ship, fine.  But I don't see it working out at the

21  moment.

22       Now, you can make -- because I know it's important to

23  Jinhua and Jinhua is very concerned, and has been from the

24  beginning, in endeavoring to show that this is UMC's problem,

25  between UMC and Micron and the dishonest people who were at

1   Micron and went to UMC and you guys are just collaterally

2   involved here.

3        But make your last statement, and then I'll wrap it up.

4   Unless it's really telling, I'm going to stick with what I said

5   for the reasons I did.

6        Okay.  Go ahead.

7        **MR. SLOAN:**  Yeah.  Your Honor, I guess I make two points.

8        One is that I think there is a body of case law that shows

9   that the defendants are allowed to put the Government's

10  investigation on trial, to hold up for the jury and to show

11  that the Government hasn't done a fulsome investigation.

12       And this is a case where, you know, as we've mentioned

13  before, as we've argued before with respect to the bill of

14  particulars, we've looked through millions -- literally

15  millions of documents and have found no evidence that the

16  Government has that Jinhua was involved in any of this conduct.

17       And I guess it leads us to the question:  How is it that

18  the Government decided to charge Jinhua?

19       And we think that these communications may provide answers

20  to those questions.

21       **THE COURT:**  Well, okay.  I did read the authority that you

22  cited, but it was different.  It was like somebody had a

23  particular defense; and because of what the prosecution did,

24  the evidence was lost.  It was known evidence, and it was lost

25  by the Government, who hadn't really done anything proper.

 1          But it isn't just -- I mean, someone can always get up and

 2     say, "Hey, you didn't look at this.  You didn't look at that.

 3     This is really sloppy, and as a result, you don't have a good

 4     case."

 5          Frankly, Jinhua has said from the beginning, "Where is

 6     your case?"  They started with, "We want a bill of

 7     particulars," your first time, before your office got involved.

 8     Okay.  "Where is your case?  There's nothing here in the

 9     indictment?  We've never been given anything that says we are

10     at fault.  We want a bill of particulars."

11          At which point I asked the Government, "Do you have

12     anything more?"

13          And they said, "No."

14          Okay.  And they have a theory.  And I think their theory

15     is that when you took on Mr. Chen, that his state of mind came

16     with him.  He then became you.  And then you did whatever you

17     did with whatever he brought, which may be nothing or it may be

18     something.  And it's kind of unusual.  Your office is going to

19     look into whether you can be stuck with Mr. Chen and whatever

20     baggage he brought with him or whether are able to separate

21     yourself from him legally.

22          But my understanding is you're going to say:  We can show

23     he's at fault, and he became you.

24          Okay?  Now, I don't know if that's going to totally fly,

25     but that's their theory.  Okay?  If he hadn't come aboard,

1  you'd have a stronger argument than if he were hired, since

2  he's supposed to know everything that was taken.  I don't know

3  whether he did.  I'm just a bystander.

4      So, okay.  So that's going to be the ruling.  And I don't

5  know if I'll do anything more than just issue an order that

6  said that's the ruling as said or whether I'll try to break it

7  down.

8      I just want to make clear that there may be further

9  documents to be delivered under 1 to 5 and 7 for the expanded

10  time period which would go as far, then, as September 27 of

11  2018 for the reasons I said.

12      Okay.  Okay.  That was a lot of stuff.  I don't --

13                  (Laughter.)

14      **THE COURT:**  I don't know what else we can do right now.

15  There's nothing personal, Mr. Sloan, by the way.  Okay.

16      **MR. SLOAN:**  I don't take it personally, Your Honor.

17                  (Laughter.)

18      **THE COURT:**  So I'm not sure where we are.  Have we done

19  whatever we can do on this particular matter today?  I think we

20  have.

21      **MR. STEPHENS:**  Yes, Your Honor.

22      **MR. SLOAN:**  I think we have too, yes.

23      **THE COURT:**  All right, then.  That will conclude the

24  matter at this time.

25      Thank you very much.

 1          It was interesting.  As I say, this hasn't come up that

 2    much, and certainly not in this broad context of so many

 3    different things.  So, okay.  Thanks.

 4          We're in recess.

 5          **MR. SLOAN:**  Thank you, Your Honor.

 6          **MR. STEPHENS:**  Have a good afternoon.

 7          **THE COURT:**  Same to everyone.  Thank you.

 8          **THE CLERK:**  Court is in recess.

 9              (Proceedings adjourned at 4:50 p.m.)

10                      ---o0o---

11

12              **CERTIFICATE OF REPORTER**

13          I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:  Saturday, July 31, 2021

17          _Ana Dub_

18    _____

19    Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                Official United States Reporter

20

21

22

23

24

25